Opinion issued May 10, 2007

 

 



 

 







In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00016-CR






KEVIN EDWARD GOODRICH, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 240th District Court

Fort Bend County, Texas

Trial Court Cause No. 39,072






MEMORANDUM OPINION 

 

 A jury convicted appellant, Kevin Edward Goodrich, of murder and assessed
punishment at imprisonment for life. Tex. Pen. Code Ann. § 19.02 (b)(1),(2)
(Vernon 2003). In three points of error, appellant argues that (1) the evidence was
legally and factually insufficient to sustain a conviction for murder and (2) trial court
failed to properly instruct the jury on his defense of accident. We affirm.Background The evidence shows that, on the morning of September 13, 2003, appellant's
wife, Sandra Goodrich (the "complainant"), was killed by a single gun shot wound
to the head. 

 The State presented the testimony of numerous witnesses. Danielle Bacorn,
appellant's neighbor, testified that, on the morning that the complainant was shot, she
heard a "popping noise," and she did not think anything of it at first. She went
outside 10 to 15 minutes later when she heard yelling. Once outside, she discovered
appellant on the phone with emergency services. Brian Gazaway, a 911 emergency
dispatcher, then testified that he received appellant's 911 call following the shooting. 
Gazaway indicated that, while appellant was frantic and difficult to understand over
the phone, he found appellant's behavior to be out of the ordinary. Gazaway stated
that, to some extent, he thought appellant's demeanor over the phone was an act. 

 Deputy Carlos Carillo, a patrol officer with the Fort Bend County Sheriff's
Department, was the first to respond to the scene. Upon arriving at the scene, Deputy
Carillo saw appellant lying next to the complainant and yelling for help. He also saw
a hole in the front screen door and glass outside on the porch. According to his
testimony, Deputy Carillo was told by appellant that the shooting was an accident. 
Specifically, appellant told Deputy Carillo that, because he heard banging on the
door, he thought his home was being burglarized, and he shot through the door. 
Deputy Carillo further testified that, although appellant was yelling and screaming,
he never shed a tear. This behavior caused Deputy Carillo to be suspicious of
appellant. 

 The testimony of Detective James Fotenot, the investigating homicide
detective, indicated that he also believed that appellant's attitude and lack of emotion
were suspicious. Detective Fotenot noticed that as people approached the police car
where appellant was seated, appellant would begin "howling;" whereas when people
would move away from the police car, appellant stopped "howling." Appellant
recounted to Detective Fotenot a different version of events than he had told Deputy
Carillo. Appellant told Fotenot that, as he was waiting for the complainant to come
home, he decided to clean his gun. Appellant further informed Detective Fotenot that
he opened his gun cleaning kit and emptied the rounds out of his gun when he
decided not to clean the gun because he was tired. Appellant was later awakened by
the sound of his dog barking. Appellant looked out the front window to see that the
complainant was home. He unlocked the door and reached to open it so that the dog
could greet the complainant. As he opened the door, he was knocked over by the dog
and accidentally fired the weapon, killing the complainant. 

 In addition to the inconsistent description of events that night, Detective
Fotenot found several other things that were inconsistent with appellant's story. For
example, the gun used in the shooting was found inside the home under a stool,
appellant's gun cleaning kit was unused, and the glass from the screen door was
located outside the house, indicating that the door was open at the time the
complainant was shot. 

 Dr. Dwayne Wolf, a Deputy Chief Medical Examiner, testified that the cause
of the complainant's death was a single gunshot wound to the head. Dr. Wolf
performed the autopsy and ruled the complainant's death a homicide. His forensic
testing indicated that the complainant had a significant amount of gunshot residue on
her left hand, meaning her left hand was in the vicinity of the gun when it was fired. 
Dr. Wolf testified that the scenario appellant provided the police was incorrect
because, had the complainant been outside of a closed door at the time she was shot,
the gunshot residue would not have been present. When asked whether the evidence
was consistent with the State's theory that appellant had pinned the complainant
behind the screen door and that she was reaching around the door to block the gun at
the time it fired, Dr. Wolf answered "yes." 

 Additionally, the State presented the testimony of several of the complainant's
friends and family. Each of these witnesses indicated that the complainant was
struggling in her marriage to appellant and that she wanted a divorce. 

 Evidence of a financial motive for the complainant's death was also introduced. 
The complainant's office manager, Jeannie Trippie, testified that, two days after the
complainant's death, appellant called her to inquire about the complainant's life
insurance policy. According to Trippie, he stated that he had "a lot of bills to pay"
and needed "to find out about the insurance." Trippie transferred appellant's call to
Tina Waggoner, a human resources employee. Waggoner testified that, when she
spoke with appellant, he was upset, but that his demeanor changed when she told him
that the complainant's life insurance policy was worth $180,000. She further testified
that, upon learning the policy's value, appellant stated "Goddamn, I didn't know she
had that much money." Appellant's testimony on cross-examination revealed that he
and the complainant had significantly depleted their financial resources, including an
inheritance from his grandmother and the complainant's 401(k) retirement account. 
While appellant disagreed that the couple was "financially strapped," he indicated
that they "weren't well off." 

 After the State rested its case, appellant presented his own testimony, as well
as the testimony of two additional witnesses. In his testimony, appellant denied much
of the other witnesses' testimony. For example, he denied telling Deputy Carillo that
he believed his home was being burglarized when he fired the gun. He also denied
having any knowledge of the complainant's life insurance policy. Appellant
recounted the accidental shooting of his wife, again indicating that she was killed
when the dog "knocked [his] legs out from under [him]," causing the gun to
accidentally fire. In his testimony before the jury, however, he further indicated that,
before the shooting occurred, he and the complainant fought because she had not
come home the night before. He also testified that, while he and the complainant had
experienced marital problems in the past, they were getting along well and had even
discussed having a family. 

 Dr. Linda Jean Cordell, appellant's psychiatrist, testified that she had treated
appellant for approximately seven years and that, during those treatments, she had
met the complainant on a few occasions. It was her opinion that the complainant was
comfortable around appellant and wanted to take an active role in his treatment. In
addition, Douglas Bilbey, a volunteer on a rodeo committee, testified that he had
interacted with appellant and the complainant through his volunteer work at the
rodeo. In his opinion, appellant and the complainant seemed to get along well. 

 After the close of all of the evidence, a charge conference was conducted,
during which appellant asked the trial court to instruct the jury on his defense of
accident. The trial court denied the request for an accident instruction, and instead
instructed the jury on the requirement that appellant's conduct be voluntary. The jury
found appellant guilty of murder and sentenced him to imprisonment for life. 
Appellant filed this appeal. 

 Sufficiency of the Evidence 


 In his first and second points of error, appellant argues that the evidence was
legally and factually insufficient to sustain his murder conviction. Specifically,
appellant argues that, because the evidence shows that complainant's death was an
accident, the State failed to prove that he had the requisite intent to commit murder. 
We disagree. 

Standard of Review

 In our legal-sufficiency review, we view the evidence in the light most
favorable to the verdict and ask whether any rational trier of fact could have found
the crime's essential elements beyond a reasonable doubt. Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). When conducting a factual-sufficiency review,
we view all of the evidence in a neutral light. Cain v. State, 958 S.W.2d 404, 408
(Tex. Crim. App. 1997). We will set the verdict aside only if (1) the evidence is so
weak that the verdict is clearly wrong and manifestly unjust or (2) the evidence
supporting the verdict is against the great weight and preponderance of the evidence. 
Johnson, 23 S.W.3d at 11. Under the first prong of Johnson, we cannot conclude that
a conviction is "clearly wrong" or "manifestly unjust" simply because, on the
quantum of evidence admitted, we would have voted to acquit had we been on the
jury. Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the
second prong of Johnson, we cannot declare that a conflict in the evidence justifies
a new trial simply because we disagree with the jury's resolution of that conflict. Id. 
Before finding that evidence is factually insufficient to support a verdict under the
second prong of Johnson, we must be able to say, with some objective basis in the
record, that the great weight and preponderance of the evidence contradicts the jury's
verdict. Id. In our factual-sufficiency review, we must also discuss the evidence that,
according to appellant, most undermines the jury's verdict. See Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). 

 We may not re-weigh the evidence and substitute our judgment for that of the
fact-finder. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The fact-finder alone determines the weight to be given contradictory testimonial evidence
because that determination depends on the fact-finder's evaluation of credibility and
demeanor. Cain, 958 S.W.2d at 408-09. As the determiner of the credibility of the
witnesses, the fact-finder may choose to believe all, some, or none of the testimony
presented. Id. at 407 n.5. 

Analysis

 The indictment alleged that appellant "intentionally and knowingly cause[d]
the death of Sandra Goodrich, hereinafter called the Complainant, by shooting her
with a firearm." Alternatively, the indictment alleged that appellant "unlawfully
intende[d] to cause serious bodily injury to Sandra Goodrich, hereinafter called the
Complainant, and did cause the death of the Complainant by intentionally and
knowingly committing an act clearly dangerous to human life, namely by shooting her
with a firearm." Murder, as alleged here, is a "result of conduct" offense. See
Schroeder v. State, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (noting that an
accused's culpable mental state relates to the result of the conduct, i.e., the causing
of death). A person acts "intentionally, or with intent, with respect to . . . a result of
his conduct when it is his conscious objective or desire to . . . cause the result." Tex.
Pen. Code Ann. § 6.03(a) (Vernon 2003). The requisite element of intent may be
inferred from the conduct of, remarks by, and circumstances surrounding the acts in
engaged in by an accused. See Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App.
2004). While motive is not an element of the offense of murder, it may be
circumstantial evidence of intent. See id. 

 Here, appellant concedes that he fired the gun that caused the complainant's
death. The evidence viewed in the light most favorable to the verdict shows that the
cause of the complainant's death was a single gunshot wound to the head. Dr. Wolf,
Deputy Chief Medical Examiner for Harris County, performed the autopsy and ruled
her death a homicide. His forensic testing indicated that the complainant had a
significant amount of gunshot residue on her left hand, meaning her left hand was in
the vicinity of the gun when it was fired. When asked whether the evidence was
consistent with the State's theory that the complainant reached around the screen door
to block the gun, Dr. Wolf answered "yes." 

 The State also offered the testimony of several witnesses who indicated that the
complainant was struggling in her marriage with appellant. Several of the
complainant's co-workers, friends, and relatives testified that the complainant had
spoken with them about her desire for a divorce. Appellant's own testimony
indicated that the complainant had not come home the night before she was killed and
that, when she returned the next morning, she and appellant fought. Both Deputy
Carillo and Detective Fotenot, the investigating homicide detective, testified that they
believed appellant's attitude and lack of emotion were suspicious. 

 Finally, there was evidence that appellant benefitted financially from the
complainant's death. The complainant's office manager, Jeannie Trippie, testified
that, two days after the complainant's death, appellant called her to inquire about the
complainant's life insurance policy. According to Trippie, he stated that he had "a
lot of bills to pay" and needed "to find out about the insurance." Trippie transferred
appellant's call to Tina Waggoner, a human resources employee. Waggoner testified
that, when she spoke with appellant, he was upset, but that his whole demeanor
changed when she told him that the complainant's life insurance policy was worth
$180,000. She further testified that, upon learning the policy's value, appellant stated
"Goddamn, I didn't know she had that much money." Appellant's testimony on
cross-examination revealed that he and the complainant had significantly depleted
their financial resources, including an inheritance from his grandmother and the
complainant's 401(k) retirement account. While appellant disagreed that the couple
was "financially strapped," he indicated that they "weren't well off." 

 As the determiner of the credibility of the witnesses, the jury was at liberty to
believe all, some, or none of the testimony presented. Cain, 958 S.W.2d at 408-09.
While the evidence of appellant's intent to cause the complainant's death is
circumstantial, the cumulative force of the circumstances is such that a rational jury
could have found that this evidence established appellant's culpable mental state
beyond a reasonable doubt. Johnson, 23 S.W.3d at 11. The evidence, therefore, is
legally sufficient to sustain his conviction for murder.

 Accordingly, we overrule point of error one. 

 As evidence to the contrary, appellant relies on his own testimony that the
firing of the gun was an accident, as well as the testimony of his psychiatrist, Dr.
Cordell, and his colleague, Douglas Bilbrey. Specifically, appellant testified that,
even though he and the complainant fought from time to time, the complainant was
not unhappy in their marriage. Appellant indicated that, the night before she was
killed, the complainant had not come home. Appellant went looking for her and,
when that failed, he waited up all night at home. After deciding to clean his gun at
approximately 5:00 a.m., appellant fell asleep. He was awakened by the sound of his
dog barking. Appellant looked through the front window and saw that the
complainant's car was in the driveway. When appellant opened the front door to let
the dog out to see the complainant, the dog ran for the door and "took [his] legs out
from under [him]." It was at that point that appellant heard the explosion from the
gun. Initially, he thought he had injured the dog, but later realized it was the
complainant who had been shot. 

 Dr. Cordell testified that she treated appellant for pain management,
depression, and anxiety. During appellant's appointments, she had the opportunity
to meet the complainant and, in her opinion, the complainant was very interested in
helping appellant. Douglas Bilbrey testified that he met appellant volunteering for
a rodeo committee and that, frequently, appellant would bring the complainant along
for his volunteer shifts. He also testified that, in his opinion, the complainant and
appellant "seemed to get along very well." 

 As further evidence to the contrary, appellant presented a newspaper article
about the complainant's death indicating that, initially, he was released by the police
because they did not suspect any foul play. He also refuted the testimony of some of
the State's witnesses. Specifically, he denied telling Deputy Carillo that he believed
a burglar was entering his home at the time he fired the gun. He also denied having
any knowledge about the complainant's life insurance policy or calling her employer
to inquire about the policy. Even considering appellant's evidence, it cannot be said
that the jury's finding of guilt was against the great weight and preponderance of the
evidence. Watson, 204 S.W.3d at 417. Neither can it be said that the contrary
evidence relied upon by appellant renders the verdict clearly wrong or manifestly
unjust. Id. We hold that the evidence, therefore, is factually sufficient to sustain
appellant's murder conviction. 

 Accordingly, we overrule point of error two.

Charge Error 

 In his third point of error, appellant argues that the trial court erred by refusing
his request to instruct the jury on his defense of accident. We disagree. 

Standard of Review

 We review a trial court's jury charge first, to determine whether the charge
given was erroneous, and, second, to determine whether the error, if any, caused
sufficient harm so as to require a reversal. Nguyen v. State, 811 S.W.2d 165, 167
(Tex. App.--Houston [1st Dist.] 1991, pet. ref'd). If the error in the charge was the
subject of a timely objection in the trial court, then reversal is required if the error is
"calculated to injure the rights of defendant," which means that there must be some
harm to the accused from the error. Almanza v. State, 686 S.W.2d 157, 171 (Tex.
Crim. App. 1984).

Analysis 

 "It is well settled that an accused has the right to an instruction on any
defensive issue raised by the evidence, whether that evidence is weak or strong,
unimpeached or contradicted, and regardless of what the trial court may or may not
think about the credibility of the evidence." Granger v. State, 3 S.W.3d 36, 38 (Tex.
Crim. App. 1999). The defendant's testimony alone may be sufficient to raise a
defensive theory that requires an instruction in the jury charge. Thomas v. State, 678
S.W.2d 82, 84 (Tex. Crim. App. 1984).

 A request for an instruction on "accident" is properly denied by the trial cout
because there is no longer any such defensive "accident" theory which requires a jury
instruction. See Rogers v. State, 105 S.W.3d 630, 637 (Tex. Crim. App. 2003) (citing
Williams v. State, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982) ("There is no law and
defense of accident in the present penal code, and the bench and bar would be well
advised to avoid the term 'accident' in connection with offenses defined by the
present penal code.")). Because "accident" is not a defensive theory which requires
a jury instruction, the trial court did not err in denying appellant's request. See
Rogers, 105 S.W.3d at 637. 

 Accordingly, we overrule point of error three. 

Conclusion

 We affirm the judgment of the trial court. 


 George C. Hanks, Jr.

 Justice


Panel consists of Justices Taft, Alcala, and Hanks.

Do not publish. Tex. R. App. P. 47.2(b).